514 So.2d 738 (1987)
Cathy CHERRY, Plaintiff-Appellant,
v.
MONROE MUNICIPAL FIRE & POLICE CIVIL SERVICE BOARD, Defendant-Appellee.
No. 19074-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1987.
Bruscato, Loomis, Street & Anzelmo by Albert E. Loomis, III, Monroe, for plaintiff-appellant.
*739 Thomas V. Gardner, Jr., Asst. City. Atty., Monroe, for defendant-appellee.
Before MARVIN, FRED W. JONES, Jr., and LINDSAY, JJ.
MARVIN, Judge.
After her unsuccessful appeal to the district court, a police officer appeals a ruling of the Monroe Fire and Police Civil Service Board that upheld her suspension for two days without pay. She contends that the board's ruling was not made in good faith and for cause as required by LRS 33:2561 because the evidence was legally insufficient to support the discipline imposed.
We affirm.
"Cause" in § 2561 is synonymous with legal cause. McIntosh v. Monroe Mun. Fire, Etc., 389 So.2d 410 (La.App. 2d Cir.1980), writ denied. "Good faith" in § 2561 is the opposite of arbitrary or capricious action or of action that stems from prejudice or political expediency on the part of the appointing authority. If the evidence does not show that the disciplinary action was necessary for discipline and efficiency of the police department or was required to avoid some detriment to the department, the disciplinary action is found not to be "for cause." Martin v. City of St. Martinville, 321 So.2d 532 (La.App. 3d Cir.1975), writ denied.
Appellant attacked only the sufficiency or quality of the evidence and did not allege or attempt to show that the discipline complained of arose out of prejudice or political motives.
The civil service board has the responsibility to determine the credibility of witnesses, evaluate testimony, and find facts. The courts determine if the board acted in good faith and for cause as the statute requires. See City of Westwego v. McKee, 448 So.2d 166 (La.App. 5th Cir. 1984).

FACTS
The suspension resulted from Officer Cathy Cherry's conduct at the Monroe Holiday Inn-Holidome motel on April 25, 1986, during Vice President Bush's visit to Monroe. As part of the security arrangements with federal Secret Service Agents, Cherry was assigned to the roof of the two-story motel. Cherry went to the roof to assist and to relieve Officer Webb, who remained with Cherry on the roof for approximately 15 minutes. Secret Service Agent Maggio and Detective Petterson were stationed on the ground at a designated motel entry where the Vice President's limousine was to stop and allow Bush to depart the vehicle and enter the motel.
To avoid their being identified as possible terrorists, or assassins, all officers stationed upon rooftops were to remain outside the visibility of officers on the ground. The crux of Cherry's alleged misconduct lies in her failure to properly position herself on the motel roof. At least three orders or requests were made to Officer Cherry to reposition herself. Cherry remained visible from the ground as the Vice President's motorcade arrived at the motel.
At a briefing earlier in the day, no instructions were given concerning the proper positioning of the officers assigned to the roof positions, although all officers knew they were to follow instructions from Secret Service.
The evidence against Cherry consists of the testimony of several of her fellow officers which, if believed, clearly establishes unprofessional and uncooperative conduct on her part.
According to the testimony of Sergeant Dean, Cherry was, from the outset, unenthusiastic about being assigned to the motel roof.
Q. So, notwithstanding griping she went to the roof at the appointed time?
A. Yes, sir. She mumbled and grumbled as I asked her to go on up and relieve Officer Webb.
Shortly after Cherry reached the roof, Cherry and Webb were instructed on how to position themselves. According to Cherry, Special Agent Maggio shouted directions from the ground. Webb stated that both Maggio and Detective Petterson shouted directions, that Cherry was at his *740 side when the directions were shouted, and that he heard the directions clearly. Both Cherry and Webb initially obeyed the directions and Webb left the roof about five minutes later.
Petterson testified that after he directed Cherry and Webb "to get back and get down where they couldn't be seen by the motorcade," Maggio said he was able to see Cherry's head.
... [Maggio] said "I can still see her head," Officer Cherry's head. He looked at me. He said, "Did you tell them to get back?" I said, "Yes, I did." So, he came back and he said, "Where's the supervisor? I'm going to have a supervisor tell them, so it will come from a supervisor."
Maggio then located a supervisor, Lieutenant Taylor, to give express orders. Taylor stated:
Finally, after I told her, in a very commanding and loud voice the third time, she finally moved back out of the way. And the agent asked me if she was hard of hearing, or just didn't want to cooperate or what.
The directions were given to Cherry by Maggio, by Petterson and by Taylor as the Vice President was approaching the motel. When the motorcade arrived at the motel entry shortly after Taylor had instructed Cherry, Cherry remained visible from the ground. Sergeant Bougere, who was assigned to the motorcade, stated:
And even when we arrived, we could still visibly see her. And [Maggio] had to, in fact, tell the other Secret Service agents that she was, in fact, a police officer so they wouldn't shoot her.
The charges against Cherry also include Cherry's reluctance to return to the roof after being allowed a short rest on the ground. Sergeant Dean ordered Cherry back on the roof. Cherry responded:
I said, "you've got to be kidding.: And he saidpointed at his watchand he said, "You've got twenty minutes." And I said, "You're going to make me come back up for twenty minutes?" And he said, "Yes." And I said, "I'm not coming back up for twenty minutes." And he said, "Oh, yes, you are."
Cherry then returned to the roof. She contends this was mere grumbling, not insubordination.
When asked about Cherry's "attitude" during the vice presidential detail, Sergeant Dean stated:
Everything had to be pulled from her. She had to be ordered to this, she grumbled about that. It was justI thought she was in a bad mood, or something.
On the recited testimony, we cannot say the board's decision was arbitrary or capricious. The testimony, if believed, establishes the "non-caring attitude" and failure to follow instructions as alleged in the assistant chief's letter to Officer Cherry:
... while assigned to a special detail to provide security for the Vice President of the United States of America and his party, you failed to conduct yourself in a professional manner as a police officer.
(1) You failed to follow the instructions of your immediate supervisor.
(2) You displayed a non-caring attitude in the presence of fellow officers and supervisors.
(3) You failed to fulfill your duties and responsibilities after repeatedly being told what to do.
(4) You deliberately failed to follow instructions of other supervisors present.
The assistant chief's allegation that Cherry "deliberately" failed to follow instructions is easily inferred from Webb's statement that he clearly understood the directions given them as he and Cherry stood, side-by-side, on the roof of the two-story motel.
The board's decision was neither arbitrary nor capricious. Prejudice or political expediency is neither alleged nor indicated, and the absence of good faith is not shown in this record. See Martin v. City of St. Martinville, supra.
Finding the board acted in good faith, we also find legal cause for the two-day suspension. Discipline within the police department would be difficult to maintain if an assistant chief were not allowed to impose minor disciplinary penalties where an *741 officer acts in an unprofessional manner in disregard of specific orders or directions and endangers his or her own life. The assistant chief's response to the type of behavior the board, in good faith, found to have occurred, we conclude was "necessary for the discipline and efficiency of the police department." Martin v. City of St. Martinville, supra, at p. 535.
The judgment of the district court is AFFIRMED at appellant's cost.